UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.  22cr10192 |
| v. | Violations: |
| (1) DOYAL KALITA,<br>a/k/a "Bhaskar Kalita",<br>a/k/a "Bhaskar Doial",<br>a/k/a "Doial Kalita", | Count One: Wire Fraud Conspiracy<br>(18 U.S.C. § 1349) |
| (2) ▇▇▇▇▇▇ | Count Two: Conspiracy to Import Schedule II<br>and Schedule IV Controlled Substances<br>(21 U.S.C. § 963) |
| and | Count Three: Money Laundering Conspiracy<br>(18 U.S.C. § 1956(h)) |
| (3) ▇▇▇▇▇▇ | Counts Four and Five: Distribution of Tapentadol<br>(21 U.S.C. §§ 841(a)(1) and (b)(1)(C)) |
| Defendants | Count Six: Conspiracy to Distribute Tapentadol,<br>Tramadol, and Carisoprodol<br>(21 U.S.C. § 846) |
| | Wire Fraud Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461) |
| | Drug Forfeiture Allegation:<br>(21 U.S.C. § 853) |
| | Money Laundering Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(1)) |

## INDICTMENT

At all times relevant to this Indictment:

### General Allegations

1.      Starting no later than 2015 and continuing until at least 2021, defendant DOYAL

KALITA, a/k/a "Bhaskar Kalita", "Bhaskar Doial", and "Doial Kalita" ("KALITA"), was a

member of at least three related conspiracies:

      a.      a wire fraud conspiracy, to obtain money from victims by inducing them to pay for unnecessary computer technical support, in violation of 18 U.S.C. § 1343;

      b.      a drug importation conspiracy, to import Schedule II and Schedule IV controlled substances into the United States from India and Singapore, in violation of 21 U.S.C. § 952; and

      c.      a money laundering conspiracy, to engage in financial transactions involving the proceeds of both his and others' unlawful activities, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii) (together, "the Conspiracies").

*Defendants*

2.      KALITA lived in Michigan, where he registered and controlled purported businesses in furtherance of the Conspiracies, including, but not limited to:

      a.      Kiki Web Solutions;

      b.      Doyle Techno Solutions LLC, registered for general business purposes;

      c.      SuperNinTechno LLC, registered for the purpose of "computer servicing and tune-ups"; and

      d.      Dreamlandtrip LLC, registered for the purpose of "travel, hotel, air flight and ticketbooking."

3.      ████████████████████████████████████████████████

4.      ████████████████████████████████████████   ████████

operated an online pharmacy, ████████ that illegally sold controlled substances and other prescription drugs to persons in the United States.

2

*Co-conspirators*

5. Co-conspirator 1 ("CC-1") lived in Michigan, where s/he registered and controlled Entity A, a limited liability company formed for the purported purpose of conducting "e-commerce."

6. Co-conspirator 2 ("CC-2") lived in Michigan and operated Zayn Techno, a purported computer technical support company.

7. Co-Conspirator 3 ("CC-3") lived in the United States. With KALITA, CC-3 laundered money from fraud and drug importation and distribution schemes, using merchant accounts and bank accounts held in the names of shell companies that CC-3 owned and controlled.

Object and Purpose of the Wire Fraud Conspiracy and the Scheme to Defraud

8. It was the object of the wire fraud conspiracy and the scheme to defraud to induce victims into making payments for computer technical support that they did not need or had not received. It was the purpose of the wire fraud conspiracy and the scheme to defraud to make money and to conceal its activities from law enforcement.

Manner and Means of the Conspiracy and Scheme to Defraud

9. Among the manner and means by which KALITA,      CC-2, CC-3, and co-conspirators known and unknown to the Grand Jury carried out the conspiracy and the scheme to defraud were the following:

a. Causing pop-up screens to appear on victims' computers as they browsed the internet;

b. Falsely warning victims in the pop-up screens that their computers had a problem, such as malware or a virus, and directing victims to call a phone number for help;

3

   c. Falsely claiming that the phone number would connect victims to a known technology company, such as Microsoft Corporation;

   d. Controlling call centers in India and elsewhere to receive phone calls from victims;

   e. Deceiving victims over the phone into believing that their computers had a problem, including by taking remote control of the computers to show purported vulnerabilities;

   f. Selling victims a retail anti-virus or malware program that they did not need, or charging victims for an annual service that purported to protect against viruses and malware that their computers did not have;

   g. Collecting payments through purported technical support companies that KALITA, ▮▮▮▮ and co-conspirators controlled;

   h. Opening merchant payments accounts, provided by CC-3 and others, to receive credit card payments for the unnecessary services, and to conceal the nature of the scheme and the identities of the co-conspirators executing it;

   i. Disbursing victims' payments through shell corporations and business entities' financial accounts; and

   j. Contacting victims again to falsely inform them that victims had accidentally received a "refund" from a technical support company, to induce victims to pay the purported refund "back" to co-conspirators.

   Acts in Furtherance of the Wire Fraud Conspiracy and Scheme to Defraud

  10. Between at least as early as March 2015 and in or about January 2019, KALITA, ▮▮▮▮ CC-2, CC-3, and others known and unknown to the Grand Jury committed the

following overt acts in the District of Massachusetts and elsewhere in furtherance of the wire fraud conspiracy and scheme to defraud:

      a.      On or about March 4, 2015, KALITA and ▮▮▮▮▮ emailed each other about creating SuperninTechno.com, to replace Kiki Web Solutions as a platform to commit technical support fraud, and to operate a call center that would have "a good presentation of how messed up [the victims'] computers are" with the aim of "scar[ing] the customers."

      b.      On or about March 19, 2015, in response to a chat message from KALITA asking whether their software would be "able to bring fake viruses," ▮▮▮▮▮ stated, "Yeah it can bring anything."

      c.      On or about March 20, 2015, ▮▮▮▮▮ emailed KALITA a document named "steps to fuck a customer"—a 23-step guide to deceiving victims into believing that they had previously been hacked and that their computers required repairs.

      d.      On or about August 5, 2015, ▮▮▮▮▮ texted KALITA that their operation had done $400 from calls in a new merchant account, "zayn techno."

      e.      On or about August 18, 2015, KALITA informed ▮▮▮▮▮ that victim calls were coming in, that he had loaded documents related to Doyle Techno Services and to Zayn Techno onto a shared drive, and that ▮▮▮▮▮ should use Zayn Techno as the merchant for Doyle Techno Services.

      f.      On or about August 26, 2015, ▮▮▮▮▮ emailed KALITA a revised fraud script for use by purported technical support representatives. The script included instructions for deceiving victims into believing that their computers were infected with the "Alureon" virus.

      g.      On or about September 22, 2015, an unknown co-conspirator working for Doyle Techno Services spoke twice with a computer user in Waltham, Massachusetts, who called after

encountering a pop-up that told her that her computer was damaged and that directed her/him to call for technical support.

       h.      On or about October 7, 2015, KALITA opened an account at JP Morgan Chase for the benefit of Supernin Techno LLC ("Supernin JPMC Account").

       i.      On or about November 3, 2015, one of the conspiracy's call center employees falsely told a computer user in Plymouth, Massachusetts, who called in response to one of the conspiracy's pop-up messages, that s/he worked for Microsoft Corporation;

       j.      On or about November 3, 2015, a representative of "Supernin Techno" spoke by phone with a computer user in Hyannis, Massachusetts, who called in response to one of the conspiracy's pop-up messages that falsely stated the user's computer system was damaged;

       k.      On or about November 11, 2015, KALITA emailed himself a document with a blue screen that contained the following text:   "Windows Health is Critical," "Do Not Restart," "Please Contact Windows Technical Support."   The screen directed the reader to call "Technical support" at a phone number used on invoices for KALITA's company Doyle Techno Solutions.

       l.      On or about December 3, 2015, an unknown co-conspirator took a call from a computer user in Boston, Massachusetts, who stated that he encountered a blue screen that directed him to call, and falsely stated that the warning was from the Windows operating system and was a direction to call a "Microsoft-certified technician";

       m.      On or about June 24, 2016, an unknown co-conspirator caused Victim 1, a resident of Massachusetts, to send $99.00 to the Supernin JPMC Account after Victim 1 encountered a pop-up that directed her to call for assistance, did so, and gave a purported technical support representative access to her computer.

n.      In or about June 2016, an unknown co-conspirator caused Victim 2, a resident of Massachusetts, to send a check for $159 to the Supernin JPMC Account after Victim 2 received a popup purporting to be from Microsoft, called a phone number for technical support, and gave a purported technical support representative access to her computer.

o.      On or about September 15, 2016,           emailed KALITA about two customers to whom KALITA and           s call center representatives had falsely stated that they worked for Microsoft Corporation.

p.      On or about November 16, 2016, CC-2 opened a business account for Zayn Techno LLC at JP Morgan Chase ("Zayn JPMC Account"), which then began processing checks for an entity called "VC Business Experts."

q.      On or about March 14, 2017, KALITA emailed           an order received by CC-2 for "pc support" provided by Zayn Techno.

r.      In or about May 2017, an unknown co-conspirator caused Victim 3, a resident of Massachusetts, to pay Zayno Techno approximately $479.99 for purported services, after Victim 3 called a number on a popup screen that purported to be from a technical support service associated with Microsoft and spoke with a purported technical support representative.

s.      In or about May or June 2017, an unknown co-conspirator called Victim 3, told Victim 3 that Zayn Techno erroneously paid a refund into Victim 3's account; directed Victim 3 to send the money back, and showed Victim 3 during the call that Victim 3 had received the refund. In fact, Victim 3's bank account had not received any such refund.

t.      On or about June 1, 2017, an unknown co-conspirator deposited Victim 3's check for $479.99 into the Zayn JPMC Account.

u.      On or about June 7, 2017, an unknown co-conspirator wired funds from CC-2's Zayn JPMC Account to an account owned by KALITA, from which, that same day, funds were wired to an Indian bank account in the name of VC Business Experts.

v.      On or about March 14, 2017, KALITA emailed            an order received by CC-2 from a purported customer for "pc support" provided by Zayn Techno.

w.      On or about May 3, 2017, KALITA emailed a supplier of technical support calls for "system pop up, windows pop up / System freezing."

x.      On or about January 22, 2018, KALITA emailed a merchant account provider a form signed by CC-2 for Zayn Techno providing new information about Zayn Techno's new bank account.

y.      On or about January 23, 2018, KALITA emailed a merchant account provider requesting a release of funds for Supernin Techno and his company ZD Marketing Group LLC.

z.      On or about January 31, 2019, KALITA directed CC-2 to close his/her Zayn Techno account and to set up a new merchant account to receive transfers of $50,000 or more, stating, "We will get you a cut on that," and "I will do all the paper work and accounting for it."

## The Drug Importation Conspiracy

### *Legal Background*

11.     Under the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 331(a), it is illegal to introduce a misbranded drug into interstate commerce. The FDCA defines a prescription drug as misbranded if, among other things, it is dispensed and distributed without a valid prescription; or if its labeling does not contain adequate directions for safe use or is false or misleading in any particular manner.

8

12.     In addition to the FDCA's misbranding prohibitions, the Controlled Substances Act ("CSA") governs the manufacture, distribution, dispensing, and importation of controlled substances in the United States.   The CSA and its implementing regulations identify which drugs are "controlled substances" and assign those controlled substances to one of five schedules (Schedules I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.   Under the CSA, it is illegal to import Schedule II or Schedule IV controlled substances unless the importer is registered as a controlled substance importer with the Drug Enforcement Administration.   With limited exceptions for medical professionals, pharmacies, and registered importers, the CSA makes it unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense or import a controlled substance, or to conspire to do so.

13.     Adderall, hydrocodone, oxycodone, and tapentadol are Schedule II controlled substances that may only be distributed to customers with valid prescriptions.   Adderall is a stimulant.   Hydrocodone, oxycodone, and tapentadol are narcotic opioids.

14.     Anabolic steroids, such as testosterone, are Schedule III controlled substances.

15.     Tramadol, carisoprodol, and modafinil are Schedule IV controlled substances that may only be distributed to customers with valid prescriptions.   Tramadol is a painkiller. Carisoprodol is a sedative.   Modafinil is a stimulant.

16.     Sildenafil is the active ingredient in an FDA-approved prescription drug called Viagra, and tadalafil is the active ingredient in an FDA-approved prescription drug called Cialis. Both are used to treat erectile dysfunction.

Object and Purposes of the Drug Importation Conspiracy

17.     The object of the drug importation conspiracy was to import into the United States for distribution misbranded drugs, controlled substances, and non-controlled drugs sold only by prescription in the United States in FDA-approved forms to treat conditions such as erectile dysfunction.   The purposes of the drug importation conspiracy were to enrich the co-conspirators and to evade detection by law enforcement and financial institutions.

Manner and Means of the Drug Importation Conspiracy

18.     Among the manner and means by which KALITA and co-conspirators known and unknown to the Grand Jury carried out the drug importation conspiracy were the following:

a.     Sourcing and distributing drugs, including Schedule II and Schedule IV controlled substances, from suppliers in India and Poland for importation into the United States;

b.     Importing drugs in a manner to evade detection by United States Customs;

c.     Keeping and maintaining spreadsheets of drug customer transactions;

d.     Opening, controlling, and using merchant and other financial accounts to conduct credit card transactions with drug customers in the United States, but in the names of purported travel companies, to conceal the true nature of the drug transactions; and

e.     Telling drug buyers that their purchases would appear as travel charges on their credit card statements.

f.     Creating false travel records in the names of drug customers; and

g.     Wiring proceeds from the drug transactions to co-conspirators.

Acts in Furtherance of the Drug Importation Conspiracy

19.     Between at least as early as in or about February 2015 and in or about February 2021, KALITA,          CC-1, CC-3,          and others known and unknown to the

10

Grand Jury committed the following overt acts in the District of Massachusetts and elsewhere in furtherance of the drug importation conspiracy:

     a.     On or about February 18, 2015, by text message, KALITA proposed to ▆▆▆▆▆▆ that they create a business selling anabolic steroids, which are Schedule III controlled substances, to persons in the United States;

     b.     In the same messages, KALITA proposed that the business would:

          i.     Ship drugs from India to the United States or to Windsor, Canada for reshipment;

          ii.     Use a boat from Windsor, Canada to "get the shit here in Detroit";

          iii.     Use a "shippin[g] company in [I]ndia who can pass custom of any country";

          iv.     Sell "controlled stuff" that "need [a] prescription" in the United States"; and

          v.     "[K]eep changing the name of the receiver" in the United States to evade detection by law enforcement.

     c.     On or about February 18, 2015, ▆▆▆▆▆▆ agreed in a chat to help KALITA set up the drug importation business as a side operation to their ongoing computer technical support schemes.

     d.     On or about December 7, 2015, KALITA asked CC-3 by email to help him set up a website and a call center in India to sell foreign-produced erectile dysfunction drugs, and to use India-based shippers who could ensure the drugs "passe[d] US custom [sic] with no issues." KALITA told CC-3 that the drugs they would import would be stronger than the FDA-approved formulations.

e.      On or about December 8, 2015, CC-3 told KALITA that CC-3 would not be involved directly in selling the India-produced drugs given the risk that a customer might die from taking them, but did agree to host a merchant account and directed KALITA to find shippers in India for whom CC-3 and KALITA could provide such services.

f.      On or about April 6, 2016, ▆▆▆▆ emailed KALITA a list of prescription drugs available for shipment from India, including "hydro," oxycodone, and "Addrall" (all Schedule II) and tramadol, carisoprodol, modafinil, armodafinil, phentermine, and zolpidem (all Schedule IV).

g.      On or about September 28, 2016, CC-3 emailed KALITA, "These are some of what they will be selling online for pharma deal"; s/he listed hydrocodone (Schedule II), tramadol, fioricet, carisoprodol, Xanax, alprazolam, diazapam, zolpidem, and phentermine (all Schedule IV), and "Viagra."

h.      On or about October 5, 2016, KALITA emailed the list of drugs he had received from CC-3 to a person who could provide a merchant account with the subject line, "Medicine List."

i.      On or about February 22, 2019, KALITA emailed ▆▆▆▆ and CC-3 a weekly sales report of $6,092.46 from a shipper code-named "Sales3."

j.      On or about February 27, 2019 KALITA emailed ▆▆▆▆ a chargeback from a customer who transacted with KALITA's merchant account for a purported travel agent, "FlightforAll."

k.      In or about March 2019, KALITA possessed a spreadsheet with the filename "Payout Pharma," that recorded, among other things, 154 sales of Schedule IV controlled substances (*e.g.*, tramadol, carisoprodol, zolpidem, and alprazolam). These included three sales

of tramadol 100mg to persons in East Falmouth, Natick, and Watertown, Massachusetts on February 8, 2019 and March 7, 2019, respectively.

l.      On or about March 1, 2019, KALITA's purported travel company, Dreamlandtrip LLC, wired $4,304 to ███████ in ████████

m.      On or about March 5, 2019, KALITA emailed ███████ and CC-3 a sales report for "chase Pharma payout March5th" recording $9,286.68 in sales.

n.      On or about March 8, 2019, KALITA wired $10,225.78 to ███████ in ████████

o.      On or about March 8, 2019, ███████ notified KALITA that the previous week had generated $23,333.23 in drug sales.

p.      On or about March 15, 2019, KALITA wired $4,868.78 to ███████ in ████████

q.      On or about April 2, 2019, KALITA emailed CC-3 a list of ███████'s sales on March 29, 2019, including, without limitation, sales of phentermine and alprazolam (both Schedule IV) and oxycodone, hydrocodone, and Adderall (all Schedule II).

r.      On or about April 17, 2020, CC-1 emailed KALITA a list of sales from April 13 to April 16, 2017; based on sales records kept by KALITA, those sales included sales of controlled substances including, without limitation, carisoprodol and "overseas" tramadol (both Schedule IV).

s.      On or about August 6, 2020, through a Dreamlandtrip LLC Paypal account, KALITA accepted payment of $350.00 from a customer in Bedford, Massachusetts for 180 pills of "Overseas Tramadol 200mg";

       t.      On or about October 18, 2020, through the Dreamlandtrip LLC Paypal account, KALITA accepted payment of $250 from a customer in Chicopee, Massachusetts for 180 pills of "Overseas Tapentadol 100mg".

       u.      In or about February 2021, KALITA maintained a spreadsheet of drug sales through the Dreamlandtrip LLC Paypal account. These records reflected, among other things, approximately 568 sales of controlled substances imported into the United States for distribution between March 16, 2020 and February 12, 2021, including tapentadol (Schedule II) and alprazolam, zolpidem, valium, carisoprodol, and tramadol (all Schedule IV). Of these drugs sales, 385 were for "overseas tramadol" and 74 were for "overseas tapentadol," specifying that the controlled substances had been imported into the United States.

Object and Purpose of the Money Laundering Conspiracy

20.      It was the object of the money laundering conspiracy for KALITA, CC-1, CC-3, ███████ and their co-conspirators to use travel-related merchant accounts and false travel documentation to facilitate and conceal the nature of transactions for KALITA's own drug importation conspiracy and for other drug importers and distributors. It was the purpose of the money laundering conspiracy to make money and to conceal the conspiracy's activities from law enforcement.

Manner and Means of the Money Laundering Conspiracy

21.      Among the manner and means by which KALITA, CC-1, CC-3, ███████ and co-conspirators known and unknown to the Grand Jury carried out the money laundering conspiracy were the following:

       a.      Paragraphs 18(d) through 18(g) of this Indictment are re-alleged and incorporated by reference.

Acts in Furtherance of the Money Laundering Conspiracy

22.     Starting no later than 2018, KALITA, CC-1, CC-3, ▆▆▆▆ and others known and unknown to the Grand Jury committed the following overt acts in the District of Massachusetts and elsewhere in furtherance of the money laundering conspiracy:

        a.      In or about January 2019, an independent drug dealer named "Sales5", a/k/a "India5" a/k/a "Manish", began to use KALITA and CC-3's money laundering services, when in a WhatApp chat Sales5 told CC-3 that her/his business sold oxycodone, hydrocodone, alprazolam, Adderall, and noncontrolled prescription drugs.

        b.      On or about January 15, 2019, after KALITA complained to CC-3 in a chat that they would be caught if a drug shipment was seized, CC-3 reassured KALITA that their merchant account was a travel agency and that drugs could not be traced to them.

        c.      On or about March 4, 2019, Sales5 used CC-3's travel-related merchant account to sell to a Massachusetts customer "Cenforce-100 Sildenifil Citrate Tablets IP 100 mg," an foreign drug containing the active ingredient in Viagra that is not approved by the FDA for distribution and sale in the United States.

        d.      On or about March 11, 2019, CC-3 asked ▆▆▆▆ for transaction details for a drug sale because he "need[ed] that info[] to create fake flight tickets."

        e.      On or about March 11, 2019, CC-3 messaged Sales5 that his pharmaceutical customers should expect to receive receipts that purported to be for air travel and that Sales5 should tell his customers to tell anyone who inquired that they had purchased airline tickets.

        f.      On or about March 11, 2019, an employee at CC-3's merchant account vendor emailed KALITA requesting documentation that would verify that customers had

purchased airline tickets. The list included the Massachusetts customer who bought Cenforce-100 described in Paragraph 22(c) of this Indictment.

g.      On or about March 12, 2019, KALITA emailed the merchant account employee: "Sorry for the delay, we wanted to make sure we provide the most accurate information to the best of our knowledge. Even though we are a VTC we have fully functional travel operation except the ticketing authority . . . . Most of the information had to come from India office. So due to time zone difference it took me a little bit of time. Also some tickets were issued yesterday as they were from last weekend, so that also took us some [time]."

h.      On or about March 12, 2019, KALITA attached to his email a series of purported flight itineraries issued by a travel agency in Houston, Texas, including an itinerary for the customer, described in Paragraph 22(c) of this Indictment, who had tried to purchase Viagra but instead received an illegal unapproved drug made in India. The itinerary falsely stated that the customer would fly roundtrip on Jet Blue from Ft. Lauderdale, Florida to Las Vegas, Nevada.

i.      On or about March 29, 2019, CC-3 told KALITA to tell a merchant company falsely that a pharmaceutical customer had purchased a flight for her daughter from New Jersey to Miami.

COUNT ONE
Conspiracy to Commit Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

23.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 22 of this Indictment.

24.     From in or about March 2015 through in or about December 2019, in the District of Massachusetts and elsewhere, the defendants,

(1) DOYAL KALITA, a/k/a "Bhaskar Kalita," a/k/a "Bhaskar Doial," a/k/a "Doial Kalita,"

and

(2) ▮▮▮▮▮▮▮▮

conspired with each other and with others known and unknown to the Grand Jury to commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

17

<u>COUNT TWO</u>
Conspiracy to Import Schedule II and Schedule IV Controlled Substances
(21 U.S.C. § 963)

The Grand Jury further charges:

25.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 22 of this Indictment.

26.     From on or about December 7, 2015 to on or about July 30, 2021, in the District of Massachusetts and elsewhere, the defendants,

(1) DOYAL KALITA, a/k/a "Bhaskar Kalita," a/k/a "Bhaskar Doial," a/k/a "Doial Kalita,"

(2) 

and

(3)

conspired with each other and with other persons known and unknown to the grand jury to knowingly and intentionally to import into the United States Schedule II and Schedule IV controlled substances, that is, Adderall (Schedule II), hydrocodone (Schedule II), alprazolam (Schedule IV), carisoprodol (Schedule IV), diazepam (Schedule IV), phentermine (Schedule IV), Tramadol (Schedule IV), and zolpidem (Schedule IV), intending and knowing that such controlled substances would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 952(a) and (b) and 960(a)(1), (b)(3), and (b)(6).

All in violation of Title 21, United States Code, Section 963.

COUNT THREE
Money Laundering Conspiracy
(18 U.S.C. § 1956(h))

The Grand Jury further charges:

27.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 22 of this Indictment.

28.     From in or about December 2015 through in or about July 2021, in the District of Massachusetts and elsewhere, the defendants,

(1) DOYAL KALITA, a/k/a "Bhaskar Kalita," a/k/a "Bhaskar Doial," a/k/a "Doial Kalita,"

and

(3) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

conspired with each other and with others known and unknown to the grand jury to conduct and attempt to conduct financial transactions, to wit, processing credit card transactions and receiving and transmitting wire transfers, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity, and which in fact involved the proceeds of specified unlawful activities, that is, smuggling misbranded prescription drugs into the United States, in violation of Title 18, United States Code, Section 545; distribution of Schedule II and Schedule IV controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); and importation of and conspiracy to import Schedule II and Schedule IV controlled substances, in violation of Title 21, United States Code, Sections 952 and 963, and knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of those specified unlawful activities, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

All in violation of Title 18, United States Code, Section 1956(h).

COUNTS FOUR AND FIVE
Distribution of Tapentadol
(21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

29.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 22 of this Indictment.

30.     On or about the dates below, in the District of Massachusetts and elsewhere, the defendant,

(3) ████████ ████████

did knowingly and intentionally distribute and possess with intent to distribute tapentadol, a Schedule II controlled substance.

COUNT 4:    On or about September 2, 2021, distribution of tapentadol to a person without a prescription in Massachusetts; and

COUNT 5:    On or about September 15, 2021, distribution of tapentadol to a person without a prescription in Massachusetts.

All in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

COUNT SIX
Conspiracy to Distribute Tapentadol, Tramadol, and Carisoprodol
(21 U.S.C. § 846)

The Grand Jury further charges:

31.     The Grand Jury re-alleges and incorporates by reference Paragraphs 1 through 22 of this Indictment.

32.     From at least in or about 2017 through in or about 2022, in the District of Massachusetts and elsewhere, the defendant,

(3) ███████████   ███████████

conspired with other persons known and unknown to the Grand Jury, to knowingly and intentionally distribute tapentadol, a Schedule II controlled substance, tramadol, a Schedule IV controlled substance, and carisoprodol, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

## WIRE FRAUD FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further charges:

33.    Upon conviction of the offense in violation of Title 18, United States Code, Section 1349, set forth in Count One, the defendants,

(1) DOYAL KALITA, a/k/a "Bhaskar Kalita," a/k/a "Bhaskar Doial," a/k/a "Doial Kalita,"

and

(2) ███████ ███████

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following asset:

a.    A forfeiture money judgment, in an amount to be determined at sentencing.

34.    If any of the property described in Paragraph 33, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 33 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## DRUG FORFEITURE ALLEGATION
(21 U.S.C. § 853)

The Grand Jury further alleges:

35.     Upon conviction of one or more of the offenses in violation of Title 21, United States Code, Sections 841, 846, and 963, set forth in Counts Two, Four, Five, and Six, the defendants,

(1) DOYAL KALITA, a/k/a "Bhaskar Kalita," a/k/a "Bhaskar Doial," a/k/a "Doial Kalita,"

(2) 

and

(3)

shall forfeit to the United States, under Title 21, United States Code, Section 853, any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such offenses; and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offenses. The property to be forfeited includes, but is not limited to, the following asset:

   a.     A forfeiture money judgment, in an amount to be determined at sentencing.

36.     If any of the property described in Paragraph 35, above, as being forfeitable pursuant to Title 21, United States Code, Section 853, as a result of any act or omission of the defendants --

   a.     cannot be located upon the exercise of due diligence;

   b.     has been transferred or sold to, or deposited with, a third party;

   c.     has been placed beyond the jurisdiction of the Court;

   d.     has been substantially diminished in value; or

   e.     has been commingled with other property that cannot be divided without difficulty;

it is the intention of the United States, under Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 35 above.

All pursuant to Title 21, United States Code, Section 853.

MONEY LAUNDERING FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(1))

The Grand Jury further alleges:

37.     Upon conviction of the offense in violation of 18 U.S.C. § 1956(h), set forth in

Count Three, the defendants,

(1) DOYAL KALITA, a/k/a "Bhaskar Kalita," a/k/a "Bhaskar Doial," a/k/a "Doial Kalita"

and

(3) ▮▮▮▮▮▮▮▮▮▮

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in such offense, and any property traceable to such property.

The property to be forfeited includes, but is not limited to, the following:

a.   A forfeiture money judgment, in an amount to be determined at sentencing.

38.     If any of the property described in Paragraph 37, above, as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of

the defendants --

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without
     difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in Paragraph 37 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL

FOREPERSON

KRISS BASIL
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: August 2, 2022
Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

28